**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

YANZHONG WU,

Plaintiff,

-v- 1:25-CV-1640 (AJB/ML)

CITY OF ALBANY, NEW YORK *et al.*,

Defendants.

---

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On November 24, 2025, *pro se* plaintiff Yanzhong Wu ("plaintiff") filed this civil rights action against the City of Albany, New York (the "City") and several City officials alleging that they entered his property unlawfully and thereafter assessed and prosecuted certain building code enforcement orders in a manner that violated his constitutional rights.[1] Dkt. No. 1. Plaintiff later received leave to file a supplemental complaint. Dkt. No. 27. The City defendants answered the complaint, Dkt. No. 8, and the supplemental pleading, Dkt. No. 30.

However, Chad Haviland ("Haviland"), a New York State employee who had been added as a defendant in plaintiff's supplemental pleading, moved to dismiss. Dkt. No. 32. After briefing, Dkt. Nos. 34, 37, 38, 39, 40, the Court granted that motion. Dkt. No. 45. As the Court explained, Haviland's "extremely limited involvement" in the alleged events (which involved the City and its

[1] Plaintiff sought injunctive relief, Dkt. No. 6, which was briefed, Dkt. Nos. 14, 25, and denied, Dkt. No. 33.

code enforcement officials) was insufficient to state any plausible § 1983 claims, at least as against Haviland. *Wu v. City of Albany, New York*, 2026 WL 1113441, at *4 (N.D.N.Y. Apr. 24, 2026).

On April 27, 2026, in light of the fact that the remaining defendants had answered the pleadings, U.S. Magistrate Judge Miroslav Lovric scheduled a Rule 16 conference to steer the parties toward an orderly period of discovery. Dkt. No. 46. But in advance of the conference, plaintiff moved for leave to amend or correct his pleadings. Dkt. Nos. 47, 49, 50. After plaintiff cured certain procedural defects with this request, Dkt. Nos. 48, 51, the parties briefed plaintiff's motion for leave to amend, Dkt. Nos. 52, 53, 54, which Judge Lovric granted, Dkt. No. 58.

On June 19, 2026, plaintiff filed his amended complaint. Dkt. No. 57. Plaintiff's amended complaint names as defendants the City, Senior City Code Enforcement Officer Joshua Gold ("Senior Officer Gold"), City Code Enforcement Officer Marios Katsanis ("Officer Katsanis"), City Director of Buildings and Regulatory Compliance Richard LaJoy ("Director LaJoy"), and City Code Enforcement Officer John Doe ("Officer Doe"). *See id.*

On August 11, 2026, the City, Senior Officer Gold, Officer Katsanis, and Director LaJoy (collectively "defendants") moved to dismiss plaintiff's amended complaint. Dkt. No. 60. The motion has been fully briefed, Dkt. Nos. 65, 66, and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

These factual allegations are taken from plaintiff's amended complaint and attached exhibits and will be assumed true for the purpose of assessing the motion to dismiss. Dkt. No. 57.

Plaintiff is of Chinese national origin. Am. Compl. ¶ 50. He has a mailing address in Connecticut. *See id.* ¶ 4. But he owns property at 31 Tampa Avenue (and elsewhere) in the City of Albany. *Id.* ¶¶ 4, 11; *see also id.* ¶ 18 (referring to plaintiff's "properties" plural). Some of

plaintiff's family members also own property in the City of Albany. *See, e.g.*, *id.* ¶ 18. Plaintiff alleges that between 2021 and 2024, Senior Officer Gold and Officer Katsanis "issued multiple improper and false violation notices against Plaintiff's properties and the properties of Plaintiff's family members." *Id.* According to plaintiff's amended complaint, Senior Officer Gold singled plaintiff out for enforcement actions during this three-year period of time, "selectively" citing him "for minor gravel placement near the right-of-way . . . while multiple neighboring properties maintained similar or worse conditions without any enforcement action." *Id.* ¶ 19.

On September 11, 2025, Senior Officer Gold initiated a new code enforcement action against plaintiff's property at 31 Tampa Avenue. Am. Compl. ¶¶ 7, 10 (describing initiation of "case SCF25-277669" in the City's electronic code enforcement system "with the description 'Cite for all violations including a [Stop Work Order, or SWO] for any unpermitted work'"). According to plaintiff, Senior Officer Gold initiated this code enforcement action *before* any inspection of the property had occurred, before any search warrant had been sought or obtained, before any "physical evidence of any violation had been gathered," and before plaintiff had received any notice of any alleged building code violations. *Id.* ¶ 10.

The next day, on September 12, 2025, Officer Katsanis entered plaintiff's private, fenced-in backyard at 31 Tampa Avenue without consent, notice, a warrant, or other justification. Am. Compl. ¶¶ 6, 11–12. Thereafter, Officer Katsanis issued Stop Work Order "SWO25-278059" and imposed a $1,200 penalty. *Id.* ¶ 11. Officer Katsanis posted the Stop Work Order "on the front glass door" of the residential property, "publicly branding Plaintiff as a code violator before any violation had been verified or any opportunity to respond had been provided." *Id.* ¶ 25.

Plaintiff e-mailed Senior Officer Gold to ask a series of questions about the purported legal authority for Officer Katsanis's alleged conduct. *See* Ex. A, Dkt. No. 57-1. Three days later,

Senior Officer Gold replied, "confirm[ing] in writing that no warrant, consent, administrative warrant, or exigent circumstances were required to enter Plaintiff's property." Am. Compl. ¶ 13. Senior Officer Gold further stated that a building official "doesn't need authority to enter a property if there is believed to be a violation" and that "[n]o warrant is required." *Id.* Senior Officer Gold's e-mail response also stated that "the observation of sheetrock in the rear yard alone was sufficient to issue the Stop Work Order and demand a walkthrough inspection." *Id.* According to plaintiff, "[t]his written admission by the Senior Code Enforcement Officer establishes that the warrantless entry was not an isolated mistake but a deliberate policy position." *Id.*

On September 21, 2025, plaintiff reported this alleged misconduct to Director LaJoy. Am. Compl. ¶¶ 8, 14. Plaintiff's exhibits indicate that on that date, he took a "formal appeal" of the Stop Work Order by e-mailing the City's code enforcement inbox. Ex. B, Dkt. No. 57-2. He also sent an "appeal/request for review" to Director LaJoy, the Mayor, and the City Clerk. *Id.* Plaintiff alleges that Director LaJoy ignored these written complaints and "demanded that Plaintiff submit to additional interior inspections of the property without a warrant, consent, or exigent circumstances." Am. Compl. ¶ 14. Later, on October 20, 2025, Director LaJoy issued a Notice of Violation and Order to Abate (based on the outstanding Stop Work Order), which directed plaintiff to "comply with certain alleged code violations by a specified compliance date." *Id.* ¶ 15.

On October 24, 2025, plaintiff responded by serving a state-court Notice of Claim against the City. *See* Am. Compl. ¶¶ 16–17; Ex. B, Dkt. No. 57-2. Plaintiff alleges that this caused the City's Senior Assistant Corporation Counsel Christopher M. Cech ("Attorney Cech") and the City's Corporation Counsel Robert Magee ("Attorney Magee") to retaliate: they claimed that the single Stop Work Order that had previously been issued against the 31 Tampa Avenue property was "actually four separate Stop Work Orders." Am. Compl. ¶¶ 16–17. Plaintiff further alleges

that Attorney Cech and Attorney Magee threatened plaintiff "with the issuance of unlimited additional orders" against the property. *Id.* According to plaintiff, this "escalation occurred after and in direct response to Plaintiff's exercise of his legal rights." *Id.*

On February 9, 2026, the City issued to plaintiff a state-law "criminal charge" based on "an alleged violation dated October 20, 2025 [the date on which Director LaJoy issued the Notice of Violation and Order to Abate], reflecting a delay of approximately four months." Am. Compl. ¶ 29; Ex. B, Dkt. No. 57-2. Plaintiff's exhibits indicate that this state-court criminal charge was initiated by the filing of an information (signed by Officer Katsanis) and an appearance ticket (signed by Director LaJoy). Ex. I, Dkt. No. 57-7.

Two months later, on April 2, 2026, plaintiff "observed a male individual photographing the exterior of properties at or near 45 and 47 Tampa Avenue from an unmarked vehicle." Am. Compl. ¶ 20. Plaintiff asked for identification and the individual identified himself as a City Code Enforcement Official. *Id.* However, plaintiff alleges that this person gave him a name ("Valerie Scott") that "was inconsistent with publicly available City personnel information." *Id.* According to plaintiff, this City official—the pleading calls him a John Doe Inspector—did not just take pictures of the exteriors of the properties but also entered areas of the properties "that were not open to the public," doing so "without a warrant, consent, or exigent circumstances." *Id.* ¶¶ 9, 21–22.

On April 30, 2026, the Albany City Court dismissed the "criminal charge" that had been asserted against plaintiff. Am. Compl. ¶ 27; Ex. M, Dkt. No. 57-9. However, plaintiff claims that, notwithstanding the fact that "the sole charge" against him had been dismissed, "Case No. SCF25-277669" continues to show an "In Prosecution" status in the City's online self-service portal. Am. Compl. ¶ 28. Plaintiff alleges that the City has "taken no administrative action to update the case status, lift the associated property hold, or rescind the $1,200 penalty assessment" even though this

criminal proceeding has been terminated in his favor. *Id.* Plaintiff further alleges that, at the time of the City's enforcement actions, he had been "actively attempting to sell his property at 31 Tampa Avenue." *Id.* ¶ 30. Thus, according to plaintiff, defendants' conduct "created encumbrances on the property that prevent Plaintiff from completing a sale." *Id.*

## III. LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

As before, plaintiff's *pro se* status means that his filings must be held to less stringent standards than documents drafted by an attorney. *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). Indeed, as the Second Circuit has repeatedly explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims that they suggest.

*Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Plaintiff's seven-count amended complaint asserts: (A) 42 U.S.C. § 1983 claims for an unlawful search (Count One); a violation of substantive due process (Count Two); a violation of equal protection (Count Three); malicious prosecution (Count Four); retaliation (Count Five); municipal liability (Count Six); and (B) a state-law claim for abuse of process (Count Seven). Dkt. No. 57.

**A. 42 U.S.C. § 1983**

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). However, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights secured elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff's 42 U.S.C. § 1983 claims arise under: (a) the First Amendment; (b) the Fourth Amendment; and (c) the Fourteenth Amendment. Dkt. No. 57. Because plaintiff has sued individual defendants and a municipality, the Court's analysis will proceed in two phases. First, the Court will consider the plausibility of each § 1983 claim against the individual defendants: Senior Officer Gold, Officer Katsanis, Director LaJoy, and/or Officer Doe. Second, the Court will

consider whether any of these constitutional theories might support a plausible claim for municipal liability (Count Six) directly against the City.

The reason for this approach is a logical consequence of how this area of constitutional law works. Technically speaking, a public official can be sued in an "official capacity" and/or a "personal capacity" (also called an "individual capacity"). *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The distinction between these capacities is sometimes overlooked in our case law because most § 1983 plaintiffs are just trying to recover a sum of money damages against the municipal officials who have committed the alleged constitutional wrongs against them (here, that would be the code enforcement personnel named as individual defendants).

When that is the case, that is a textbook example of what we'd call an individual-capacity § 1983 money damages claim against an individual defendant. An individual-capacity § 1983 damages claim triggers the requirement of a defendant's "personal involvement" in the alleged constitutional wrong, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (collecting cases), and implicates the doctrine of "qualified immunity," an affirmative defense that has been judicially crafted to shield public officials who make reasonable-but-mistaken judgment calls in gray areas where the law is unsettled, *see, e.g.*, *Tripathy v. McKoy*, 103 F.4th 106, 116 (2d Cir. 2024).

Sometimes, though, a § 1983 plaintiff will *also* name an individual defendant in their "official capacity." When that happens, it is useful to understand that an official-capacity suit against an individual municipal official "is treated as an action against the municipality itself." *Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005). Notably, qualified immunity is not available to municipalities, *Owen v. City of Independence*, 445 U.S. 622 (1980), so a § 1983 plaintiff can recover damages against a municipality directly as long as he can satisfy the "policy or custom"

requirements set forth in *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).[2]

In the usual case, though, a court will dismiss the official-capacity claims against the individual municipal defendants as "redundant" or "duplicative" if the plaintiff has already named the municipality as a defendant (here, that would be the City). This is because the Supreme Court's decision in *Monell*—permitting direct § 1983 suits against a municipality—obviated the need to resort to this legal fiction, at least in most situations.[3] *See, e.g.*, *Kentucky*, 473 U.S. at 167 n. 14 ("There is no longer a need to bring official-capacity actions against local government officials . . . [because] under *Monell*, . . . local government units can be sued directly for damages and injunctive or declaratory relief.").

One thing to keep in mind: *Monell* is a derivative form of liability. *See, e.g.*, *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (collecting cases). In other words, *Monell* requires a plaintiff to establish that some actor committed an underlying constitutional wrong. Notably, this does not necessarily mean that a § 1983 plaintiff must name as defendants the individual municipal officials who were acting on behalf of the municipality at the time of the alleged wrong (although most plaintiffs do, since they usually want to pursue § 1983 money damages claims against those individual bad actors directly, as mentioned above). *See, e.g.*, *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

---

[2] However, a § 1983 plaintiff cannot recover punitive damages against a municipality. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

[3] That said, an official-capacity § 1983 claim against an individual defendant is sometimes used as a vehicle to enjoin an ongoing violation of federal law (under something called the doctrine of *Ex parte Young*) when the action would otherwise be barred by an absolute immunity doctrine, such as the sovereign immunity enjoyed by a State or one of its agencies under the Eleventh Amendment. *See, e.g.*, *Walker v. N.Y. State Dep't of Health*, 788 F. Supp. 3d 427, 490–91 (E.D.N.Y. 2025) (summarizing relevant law). But resort to that legal maneuver is not required where, as here, a § 1983 plaintiff has only named non-immune (or at best qualifiedly immune) local government officials: Senior Officer Gold, Officer Katsanis, Director LaJoy, and Officer Doe.

However, because a municipality can only act through its agents or officials, this *does* mean that a § 1983 plaintiff must plausibly allege the existence of some underlying constitutional violation, *see Askins*, 727 F.3d at 253, and then find a way to tie that violation to the municipality itself through one of the methods recognized in *Monell* and its progeny. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (cleaned up) ("Under § 1983, local governments are responsible only for their *own* illegal acts.").

In sum, then, courts start with the question of whether a plaintiff has plausibly alleged any constitutional violations and, if so, ask whether any of the named individual defendants were "personally involved" in those violations (and, if asserted, determine whether any of those individuals might nevertheless be protected by "qualified immunity" in this procedural posture). Finally, courts end the analysis with the question of whether a plaintiff has plausibly alleged that the municipality itself was the so-called "moving force" behind any of those constitutional violations.

To be sure, this step-by-step framework governing 42 U.S.C. § 1983 claims is often flattened or simplified by busy trial courts. But staying mindful of this underlying structure provides a useful jumping-off point for the legal analysis that follows.

**1. Individual Defendants**

First, plaintiff has correctly named Senior Officer Gold, Officer Katsanis, Director LaJoy, and Officer Doe as defendants in their "individual capacities." Am. Compl. ¶¶ 6–9. As mentioned above, vicarious theories of liability (such as *respondeat superior*) are unavailable in the § 1983 context. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("[A] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."). Accordingly, "[t]o establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86

F.4th 987, 996 (2d Cir. 2023); *see also Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (clarifying there is no "special rule for supervisory liability" and holding that the same "personal involvement" requirement must be satisfied as to each individual defendant).

Even if a plaintiff establishes an individual defendant's personal involvement in a constitutional violation, the official may nevertheless be entitled to "qualified immunity." The doctrine of qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). Properly applied, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Qualified immunity can be resolved on a pre-answer motion to dismiss "if the defense is based on the law rather than on undiscovered or disputed facts." *Nat'l Rifle Ass'n v. Vullo*, 144 F.4th 376, 388 n.3 (2d Cir. 2025); *see also Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) (cleaned up) ("The Supreme Court has made clear that qualified immunity *can* be established by the facts alleged in a complaint, and . . . that the issue should be resolved when possible on a motion to dismiss, before the commencement of discovery, to avoid subjecting public officials to time consuming and expensive discovery.").

However, "advancing qualified immunity as a grounds for a motion to dismiss is almost always a procedural mismatch." *Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020), *abrogated on other grounds by Case v. Montana*, 607 U.S. 107 (2026). This is because a § 1983 plaintiff, "in order to state a claim of constitutional violation, need not plead facts showing the absence of such a defense." *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994). Therefore, "although it is possible for a qualified immunity defense to succeed on a motion to dismiss,

such a defense faces a formidable hurdle . . . and is usually not successful." *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022) (cleaned up). As the Second Circuit has explained:

> A defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitled him to relief. Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."

*Chamberlain*, 960 F.3d at 110 (quoting *Kenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up)); *see also Vullo*, 144 F.4th at 388 n.3 ("We generally prefer lower courts to resolve qualified immunity defenses at the summary judgment stage because, at that point, facts uncovered during discovery will have shed more light on the conduct at issue."). Accordingly, the question on a pre-answer motion to dismiss is whether, with the benefit of all those favorable inferences, the plaintiff has plausibly alleged "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017) (cleaned up).

**a. First Amendment** (Count Five)

In Count Five, plaintiff's amended complaint asserts a First Amendment retaliation claim based on defendants' alleged "escalation" of the code enforcement actions against him after he filed a Notice of Claim, submitted formal complaints to City officials, and otherwise objected in writing to the City's warrantless entry and code enforcement practices. Am. Compl. ¶¶ 81–89.

Defendants argue that this claim must be dismissed because, even assuming plaintiff's Notice of Claim and other complaints or objections qualified as "protected activity" under the First Amendment, the pleading's "own chronology defeats the causal link he asks the Court to draw." Dkt. No. 60-1 at 16–17. As defendants point out, the original Stop Work Order and $1,200 penalty

were imposed on September 12, 2025, over one month *before* plaintiff filed his Notice of Claim on October 24, 2025. *Id*. at 17. Defendants acknowledge that the alleged "re-characterization" of this $1,200 penalty into four distinct $300 penalties came *after* the Notice of Claim was filed, but point out that plaintiff attributes this conduct to Attorney Cech and/or Attorney Magee, both of whom were initially named as defendants but who have been dropped from the litigation. *Id*.

Defendants likewise acknowledge that the criminal charge against plaintiff came *after* the Notice of Claim was filed, but emphasize that this state-court prosecution did not begin until February 9, 2026, roughly four months later, and rested on plaintiff's ongoing failure to comply with the October 20, 2025 Notice of Violation and Order to Abate issued by Director LaJoy. *Id*. at 17–18. Thus, in defendants' view, the criminal charge lodged in February of 2026 was merely the continuation of an underlying enforcement action that began *before* plaintiff filed the Notice of Claim on October 24, 2025. *Id*.

In opposition, plaintiff contends that the First Amendment "protected activity" in which he engaged for purposes of this retaliation claim is not limited merely to his filing of the Notice of Claim on October 24, 2025, but includes "submitting formal complaints, and objecting in writing to warrantless entry and code enforcement practices." Dkt. No. 65 at 18. Plaintiff further argues that the "adverse actions" on which he bases this retaliation claim are not limited to the Stop Work Order issued on September 12, 2025, but include Director LaJoy's later "demand for further warrantless inspections after Plaintiff complained; the October 20, 2025 Notice of Violation; the refusal to rescind these violation notices absent a warrantless inspection; the February 9, 2026 state-court criminal charge, filed while this federal-court action was pending; the prosecution's continuation until its April 30, 2026 dismissal by the Albany City Court; and the 'In Prosecution'

designation, property hold, and penalty maintained after dismissal." *Id.* at 18 (citing Am. Compl. ¶¶ 14, 15, 43, 84, 29, 27, 77, 28) (internal references to exhibits omitted).

Defendants reply by doubling down on the notion that plaintiff's protected activity "largely occurred" *after* the code enforcement action had begun. Dkt. No. 66 at 8. In defendants' view, the allegedly adverse actions that occurred after plaintiff filed his Notice of Claim on October 24, 2025 represent an appropriate "continuation or culmination of enforcement activity already underway before the protected conduct." *Id.* at 9. Even assuming otherwise, defendants argue that plaintiff has failed to plausibly allege that any of the named defendants were "personally involved" in any of the ensuing "retaliatory" acts because all of the events preceded plaintiff's initial protected activity on October 24—Senior Officer Gold opened the enforcement action on September 11; Officer Katsanis issued the Stop Work Order on September 12; and Director LaJoy sent the Notice of Violation and Order to Abate on October 20. *Id.*

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must plausibly allege that: (1) he engaged in speech or conduct protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *See, e.g.*, *Long v. Byrne*, 146 F.4th 282, 291 (2d Cir. 2025).

Measured against this general legal standard, and after accounting for his *pro se* status, plaintiff has plausibly alleged that Senior Officer Gold, Officer Katsanis, Director LaJoy, and/or Officer Doe retaliated against him in response to protected activity.[4] First, plaintiff is obviously

[4] As a matter of logic, no inference of causation can arise as to events that predated plaintiff's initial complaint, which appears to have happened on September 21, 2025, when plaintiff reported the alleged misconduct of Senior Officer Gold and Officer Katsanis to Director LaJoy.

correct that his Notice of Claim and filing of this federal-court civil rights action, as well as his formal and informal complaints to municipal officials about the alleged constitutional violations, qualify as "protected activity" under the First Amendment. *See, e.g.*, *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) ("[T]he filing of a lawsuit . . . is protected conduct."); *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006) (observing that "complaints, protests, and lawsuits are protected speech"); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) ("The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment.").

Second, plaintiff's amended complaint goes on to plausibly allege that, after he began to engage in this protected activity directed at various senior municipal officials, the individual defendants responded with a series of "adverse actions," including but not limited to Director LaJoy's issuance of the October 20, 2025 Notice of Violation, the issuance of the February 9, 2026 state-court criminal charging documents signed by Officer Katsanis and Director LaJoy, and Officer Doe's entry into private areas of plaintiff's properties on April 2, 2026.[5]

Third, plaintiff's amended complaint plausibly alleges causation. Although it is true that a plaintiff generally cannot premise a retaliation claim on an adverse action that began before the protected activity occurred, the Court rejects defendants' argument that this general principle is sufficient to defeat this *pro se* plaintiff's entire claim as a matter of law. After all, it is unclear, at this early stage of the case, whether and to what extent defendants' continued enforcement actions against plaintiff were entirely ministerial or non-discretionary in nature (which might tend to defeat

---

[5] It is unclear whether Senior Officer Gold engaged in any actionable conduct during this period of time. Plaintiff contends that Senior Officer Gold directed the ongoing enforcement actions, and the amended complaint alleges that this defendant initiated the "case" against his property before obtaining any relevant information. The Court declines to dismiss this claim against this defendant on a pre-answer motion to dismiss a *pro se* plaintiff's civil rights complaint.

causation) or were the product of discretionary choices attributable to one or more of the defendants (and if so, the defendant-officials' motivation for doing so).[6]

Notably, plaintiff has also plausibly alleged some qualifying harm that is traceable to these events. Although defendants' actions did not appear to "chill" plaintiff's speech—he kept right on objecting—and it is unclear whether any of these actions will ultimately amount to any particular "concrete harm," *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013), plaintiff has said enough to warrant discovery: he alleges that he was actively attempting to sell his property at 31 Tampa Avenue and that these unconstitutional-but-public enforcement actions encumbered or prevented a sale. *See, e.g.*, *Dorsett*, 732 F.3d at 160 (collecting cases involving non-chill forms of "concrete harm"); *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (cautioning that First Amendment claims are heavily dependent upon the factual context alleged).

For now, the temporal proximity between the events about which plaintiff has complained is sufficient to raise an inference of causation at the motion-to-dismiss stage. *See, e.g.*, *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 554 (2d Cir. 2001) (explaining that there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action").

Finally, although defendants' opening brief does not explicitly make this argument vis-à-vis this particular claim, *see* Dkt. No. 60-1 at 20–22, qualified immunity is not a basis for pre-

---

[6] To the extent this claim is premised on the issuance of the state-court criminal charge, probable cause might pose a bar. *See, e.g.*, *Alberty v. Hunter*, 144 F.4th 408, 419 (2d Cir. 2025) (observing that "a finding of probable cause will defeat a claim of retaliatory prosecution"). The Supreme Court has recognized an exception to this rule in the context of a retaliatory arrest if the plaintiff can produce "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). This is a "slim" exception, *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024), and it is unclear whether it would apply to these facts.

answer dismissal, either. It has long been clear that a plaintiff has a First Amendment right to be free from retaliation for engaging in protected speech or conduct, such as complaining to municipal officials or bringing a civil rights lawsuit. *See, e.g.*, *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment."), *abrogated in part on other grounds by Knick v. Township of Scott*, 588 U.S. 180, 185 (2019); *Bartels v. Inc. Vill. of Lloyd*, 751 F. Supp. 2d 387, 403 (E.D.N.Y. 2010) (denying summary judgment on qualified immunity grounds where § 1983 First Amendment plaintiff alleged that municipal defendants retaliated against him for, *inter alia*, "raising concerns and complaints at public Village meetings, writing letters, and calling officials"); *Lilly v. Hall*, 2023 WL 6216875, at *4 (W.D.N.Y. Sept. 25, 2023) (opining that "it can never be 'objectively reasonable' to retaliate against someone for the exercise of free speech regardless of the means of retaliation"). Accordingly, defendants' motion to dismiss this claim will be denied.

**b. Fourth Amendment** (Count One and Count Four)

Plaintiff's amended complaint asserts Fourth Amendment claims for: (a) unlawful search (Count One); and (b) malicious prosecution (Count Four). Dkt. No. 57.

**i. Unlawful Search** (Count One)

In Count One, plaintiff's amended complaint asserts a Fourth Amendment claim for an unlawful search based on defendants' allegedly intentional "warrantless entries into protected curtilage" at 31 Tampa Avenue (on September 12, 2025) and at 45 and 47 Tampa Avenue (on April 2, 2026). Dkt. No. 57 ¶¶ 31–32.

Defendants argue that this claim must be dismissed for three reasons. First, defendants argue that this claim must be dismissed to the extent that it is based on the alleged search of 47

Tampa Avenue because the amended complaint fails to plausibly allege that plaintiff has a legal interest or other privacy expectation in that property. Dkt. No. 60-1 at 10. Second, defendants argue that this claim must be dismissed as to Officer Doe because the amended complaint merely speculates about this individual's identity. *Id*. at 11. Third, defendants argue that they are entitled to qualified immunity from this claim because it was not clearly established as of September 2025 "[w]hether a code-enforcement officer who observes building materials in a yard from outside the curtilage may enter to investigate further without obtaining a warrant." *Id*. at 21.

In opposition, plaintiff consents to dismissal of this claim "insofar as Count I is construed to assert an independent Fourth Amendment claim based solely on" the warrantless entry to 47 Tampa Avenue. Dkt. No. 65 at 6. However, plaintiff argues that he has established a qualifying privacy interest in his other properties: the fenced backyard of property he owns at 31 Tampa Avenue, and the private areas of property he owns at 45 Tampa Avenue. *Id*. at 7.

With respect to the qualified immunity issue, plaintiff contends that the relevant Fourth Amendment issues "were settled long before September 2025." Dkt. No. 65 at 25. In plaintiff's view, a 1967 opinion from the Supreme Court laid down the rule that "administrative inspections generally require a warrant absent consent or a recognized exception," and the Supreme Court has "reaffirmed and applied" the 1967 framework in an opinion from 2015. Dkt. No. 65 at 25. According to plaintiff, the contrary authority on which defendants rely is readily distinguishable from the fact pattern alleged. *Id*.

Defendants reply by reiterating that this claim should be dismissed as to Officer Doe because plaintiff has failed to identify him. Dkt. No. 66 at 4–5. Defendants further argue that plaintiff's amended complaint "does not allege facts" showing that Senior Officer Gold, Officer Katsanis, and/or Director LaJoy were "personally involved" in the warrantless entry at 45 Tampa

Avenue in April of 2026. *Id.* at 5. However, defendants acknowledge that plaintiff's citations to *Camara* and *Patel* are relevant to the question of warrantless entries into a home or its protected curtilage. *See id.* at 12.

Among other things, the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Reasonableness in the Fourth Amendment context is "generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (cleaned up).

"In the context of criminal investigations, this balance is ordinarily struck 'in favor of the procedures described by the Warrant Clause of the Fourth Amendment.'" *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 486 (S.D.N.Y. 2019) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)). Accordingly, the rule in criminal matters is straightforward: "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (cleaned up).

"Outside the criminal context, however, the Supreme Court, in assessing reasonableness, has not insisted on the procedures described by the Warrant Clause." *Airbnb, Inc.*, 373 F. Supp. 3d at 486. Instead, the Supreme Court has held that "search regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable and where the primary purpose of the search is distinguishable from the general interest in crime control." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (cleaned up).

As relevant here, "civil administrative inspection schemes, generally known as 'administrative searches,' undertaken for purposes other than to 'search[ ] for evidence of crime, fall within

this "special needs" line of authority. *Airbnb, Inc.*, 373 F. Supp. 3d at 487 (quoting *Michigan v. Tyler*, 436 U.S. 499, 511–12 (1978) (cleaned up). Even so, the Supreme Court has recognized that "administrative searches" constitute "significant intrusions upon the interests protected by the Fourth Amendment." *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 534 (1967). Accordingly, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420.

Measured against this general legal standard, and after accounting for his *pro se* status, plaintiff has plausibly alleged that Senior Officer Gold, Officer Katsanis, Director LaJoy, and/or Officer Doe violated his constitutional rights by personally conducting and/or directing unlawful, warrantless entries—"absent consent, exigent circumstances, or the like"—of protected, non-public areas of properties in which plaintiff possessed a protected Fourth Amendment interest: the entry into the fenced backyard of property he owns at 31 Tampa Avenue on September 12, 2025, and the entry of private areas of property he owns at 45 Tampa Avenue on April 2, 2026.[7] *Compare Cullen v. Vill. of Pelham Manor*, 2009 WL 1507686, at *10 (S.D.N.Y. May 28, 2009) (denying summary judgment on defendants' unlawful entry claims where building code inspector conducted warrantless entry of private areas of property without consent), *with Nasca v. Town of Brookhaven*, 2008 WL 4426906, at *7–*8 (E.D.N.Y. Sept. 25, 2008) (Bianco, J.) (granting summary judgment to defendants on unlawful entry claim where code inspector observed violations after entering public areas of property without consent).

---

[7] "The curtilage—that is, the 'area adjacent to the home and to which the activity of home life extends'—is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself." *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 7 (2013)). As relevant here, it is "clearly established that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage." *Harris v. O'Hare*, 770 F.3d 224, 240 (2d Cir. 2014) (articulating four-factor test for "curtilage").

Although defendants insist that, at least as to the first warrantless entry, Officer Katsanis may have observed code violations in plain view, that observation does not defeat this claim as a matter of law. Absent something like an emergency, a building code violation observed in plain view would only seem to form the basis for a code enforcement notice (such as a Stop Work Order) as to those observed violations. Alternatively, evidence of a violation observed in plain view could form the basis for the issuance of an administrative warrant to conduct a search. But a code violation observed in plain view does not, as far as the Court can tell, necessarily permit an official to enter private areas of the property to poke around. *See Cullen*, 2009 WL 1507686, at *10 & n.4.

Nor would qualified immunity defeat this claim, especially not on a pre-answer motion to dismiss. *See, e.g.*, *Cullen*, 2009 WL 1507686, at *13 ("The Supreme Court first held such administrative searches unlawful more than 40 years ago."). Indeed, as plaintiff points out, "[t]he pleaded conduct – entry into the curtilage of a home, without a warrant, without consent, and without any claimed exigency, to investigate a suspected code violation – falls squarely within holdings that predate it by decades." Dkt. No. 65 at 25 (internal citations omitted).

The Court likewise rejects defendants' argument that Officer Doe must be dismissed because plaintiff has yet to identify this individual. *See, e.g.*, Dkt. No. 66 at 4 ("That is not a pleaded claim against an identifiable defendant but rather a request to keep a placeholder in the case while Plaintiff searches for a defendant."). Plaintiff's amended complaint alleges that on a specific date, he personally observed an unknown male conduct warrantless entries into areas of his properties that were not open to the public. Plaintiff's amended complaint further alleges that he approached this individual, who identified himself as a City employee and gave a false name.

In short, plaintiff has alleged a discrete claim against an identifiable defendant whose true name happens to be unknown to him at this time. At the very least, plaintiff is entitled to some

discovery to try to figure out this person's identity before the three-year limitations period applicable to § 1983 claims runs out. *See, e.g.*, *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (summarizing "relation back" in the Second Circuit); *Hogan v. Fischer*, 738 F.3d 509, 517–20 (2d Cir. 2013) (finding John Doe placeholders could relate back where *pro se* plaintiff's complaint "describes with particularity the date, time, and location of the alleged [ ] incident" and "includes substantial detail concerning the appearance of his alleged assailants").

Finally, and as noted *supra*, plaintiff consents to the dismissal of this particular claim "insofar as Count I is construed to assert an independent Fourth Amendment claim based solely on" the warrantless entry to 47 Tampa Avenue. Dkt. No. 65 at 6. Accordingly, defendants' motion to dismiss this claim will be granted in part and denied in part.

**ii. Malicious Prosecution** (Count Four)

In Count Four, plaintiff's amended complaint asserts a Fourth Amendment claim for malicious prosecution based on defendants' alleged initiation and continuation of a state-court criminal proceeding against him based on "ACC § 133A-2(C)." Dkt. No. 57 ¶¶ 64–80.

Defendants argue that this claim must be dismissed because plaintiff's amended complaint fails to plausibly allege the absence of probable cause or a constitutionally sufficient "post-arraignment deprivation of liberty." Dkt. No. 60-1 at 15–16. First, as to probable cause, defendants claim that plaintiff's "own allegations establish that the City observed building materials in his yard, issued a Stop Work Order, requested an inspection or permits to verify compliance, and issued a Notice of Violation when Plaintiff did not provide either." *Id.* at 15. Defendants point out that while plaintiff "characterizes his refusal to permit a warrantless inspection as protected Fourth Amendment conduct," that "does not negate probable cause for a charge that required only proof that he failed to comply with the Notice of Violation by its deadline." *Id.* Second, as to the

question of a qualifying post-arraignment liberty interest, defendants argue that plaintiff's amended complaint does not allege that he "was arrested, detained, required to post bail, subjected to travel restrictions, or placed under any condition of release; it alleges only that he received an appearance ticket." *Id*. at 16.

In opposition, plaintiff contends that he has plausibly alleged the absence of probable cause because the criminal "referral relied on the Stop Work Order itself as evidence of a violation – 'a circular evidentiary premise.'" Dkt. No. 65 at 15. In plaintiff's view, "[a] charge whose sole predicate is noncompliance with [an unlawful] order rests on the process's defects, not on facts establishing probable cause." *Id*. As to defendants' argument about the lack of a cognizable post-arraignment restraint on his liberty, plaintiff argues that the appearance ticket ("with its attendant obligations," including the obligation to appear in court under threat of an arrest warrant) satisfies this element. *Id*. at 16.

Defendants reply by claiming that plaintiff's "probable-cause theory proceeds from the mistaken premise that probable cause for the February 2026 charge depended upon Defendants first proving every underlying suspected construction violation." Dkt. No. 66 at 7. In defendants' view, plaintiff's "continued disagreement with the factual or legal basis for the predicate enforcement determination," that is, plaintiff's failure to comply with the Notice of Violation and Order to Abate, "does not plausibly establish that [Officer] Katsanis lacked probable cause to believe Plaintiff had failed to comply with an operative municipal order." *Id*. at 7–8. Further, defendants argue that plaintiff failed to plausibly allege that Officer Gold or Director LaJoy "commenced or played an active role in the February 2026 criminal proceeding." *Id*. at 8.

A § 1983 malicious prosecution claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures. *Chiaverini v. City of Napoleon*, 602 U.S. 556,

562 (2024). A § 1983 malicious prosecution claim requires a plaintiff to "establish the elements of a malicious prosecution claim under the relevant state law," *Chapdelaine v. Desjardin*, 180 F.4th 454, 465 (2d Cir. 2026), and "a violation of his rights under the Fourth Amendment," *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019).

Thus, a § 1983 malicious prosecution claim requires a plaintiff to plausibly allege: (1) the initiation or continuation of a criminal proceeding by the defendant against the plaintiff; (2) the termination of that criminal proceeding in the plaintiff's favor; (3) a lack of probable cause for commencing the criminal proceeding; (4) that actual malice motivated the defendant's actions; and (5) "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025) (cleaned up).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (cleaned up). Notably, however, "probable cause to prosecute should not be conflated with probable cause to arrest." *Kee v. City of N.Y.*, 12 F.4th 150, 166 (2d Cir. 2021). First, in the malicious prosecution context, "probable cause must support each charge." *Alexander*, 132 F.4th at 158 (emphasis in original). Second, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury*, 721 F.3d at 95. "Probable cause, in the context of malicious prosecution, has [ ] been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Carruthers v. Colton*, 153 F.4th 169, 181 (2d Cir. 2025) (cleaned up).

Measured against this general legal standard, and after accounting for his *pro se* status, plaintiff has plausibly alleged that Senior Officer Gold, Officer Katsanis, and/or Director LaJoy maliciously prosecuted him by initiating and/or continuing a state-court criminal prosecution based

on plaintiff's failure to comply with a code enforcement proceeding despite being aware that evidence of the underlying code violations at issue were obtained by conducting improper warrantless entries of private areas of the subject properties in violation of the Fourth Amendment.[8]

In reaching this conclusion, the Court acknowledges that this claim may well turn out to be foreclosed by precedent or defeated by qualified immunity, especially after further factual development in discovery. For instance, although plaintiff vigorously disputes the constitutionality of the manner in which the City's officials first obtained evidence of building code violations at his properties, it is unclear from his amended complaint whether he disputes the *fact* of those code violations, *e.g.*, either that certain violations were in plain view or that his unlawfully searched properties were in fact non-compliant with certain aspects of the municipal building code.

Plaintiff argues that this should not matter. *See* Dkt. No. 65 at 15 ("A charge whose sole predicate is noncompliance with [an unlawful] order rests on the process's defects, not on facts establishing probable cause."). But the Second Circuit has held that, unlike in a criminal prosecution, illegally obtained evidence—so-called "fruit of the poisonous tree"—may be used to assess the existence of probable cause in a § 1983 action. *See Townes v. City of N.Y.*, 176 F.3d 138, 145–49 (2d Cir. 1999).

Some trial courts have relied on this principle to reject § 1983 claims brought by plaintiffs claiming false arrest and/or malicious prosecution. *See Quezada v. Bakraqi*, 2017 WL 4286646, at *12 n.12 (S.D.N.Y. Sept. 6, 2017) (Report & Recommendation), *adopted by* 2017 WL 4296787 (S.D.N.Y. Sept. 26, 2017), *appeal dismissed sub nom. Quezada v. 46th Precinct*, 2018 WL 3342874 (2d Cir. May 3, 2018); *see also Hardy v. Baird*, 2016 WL 2745852, at *10 (S.D.N.Y.

[8] It is unclear whether Officer Doe was "personally involved" in any relevant conduct with respect to this claim. It is also unclear whether, and if so to what extent, Senior Officer Gold may be responsible for these events. As before, however, in light of plaintiff's *pro se* status, the Court declines to dismiss these claims against these defendants on a pre-answer motion to dismiss.

May 10, 2016) (granting summary judgment on malicious prosecution claim where allegedly improper search of plaintiff's purse led to evidence of crime).

But other trial courts in this circuit have distinguished or limited this general principle. For instance, in *Penree v. City of Utica*, 2016 WL 915252 (N.D.N.Y. Mar. 4, 2016), U.S. District Judge Mae A. D'Agostino denied summary judgment to a group of law enforcement officers who sought dismissal of plaintiff's malicious prosecution claims on the basis of probable cause where they relied on evidence that was obtained *after* defendants unlawfully entered plaintiff's home. In setting the matter down for trial, Judge D'Agostino pointed out that "evidence obtained illegally that 'would clearly not be admissible' cannot then be the basis for probable cause to believe the prosecution could succeed." *Id*. at *18 (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 77 (2d Cir. 2003)).

In sum, after reviewing this area of law, the Court declines to conclude, based on an undeveloped record, that probable cause necessarily defeats this claim as a matter of law. As noted *supra*, the probable cause standard in the malicious prosecution context is more demanding. Plaintiff has plausibly alleged that defendants initiated and/or continued the state-court criminal prosecution against him despite knowing that it could not succeed, since it was based on illegally obtained evidence. *See Boyd*, 336 F.3d at 77; *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010) (observing that "initiation" element may be satisfied if defendant filed charges or other accusatory instruments); *cf. Wagner v. Hyra*, 518 F. Supp. 3d 613, 633 (N.D.N.Y. 2021) (denying motion to dismiss malicious prosecution claim where defendants allegedly arrested adult plaintiff and charged him with a defective juvenile family court appearance ticket).

Plaintiff has also plausibly alleged the remaining elements of this claim. For instance, a plausible inference of malice arises from the lack of probable cause. *See, e.g.*, *Boyd*, 336 F.3d at 78; *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996). Likewise, there is no dispute that the state-

court criminal proceeding terminated in his favor because it ended without a conviction. *See Carruthers*, 153 F.4th at 183. And contrary to defendants' confusing contention to the contrary, being forced to defend yourself in state-court criminal proceedings qualifies as a cognizable liberty restraint of constitutional dimension. *See Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013); *Wagner*, 518 F. Supp. 3d at 633 (canvassing authorities before concluding that issuance of appearance ticket can satisfy this element). Finally, qualified immunity would not definitively apply in this posture, either. *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) ("Freedom from malicious prosecution is a constitutional right that has long been clearly established."). Accordingly, defendants' motion to dismiss this claim will be denied.

**c. Fourteenth Amendment** (Count Two and Count Three)

Plaintiff's amended complaint asserts Fourteenth Amendment claims for a violation of substantive due process (Count Two) and a violation of his right to equal protection (Count Three).

**i. Substantive Due Process** (Count Two)

In Count Two, plaintiff's amended complaint asserts a Fourteenth Amendment claim for a violation of substantive due process based on defendants' "broader pattern and practice of arbitrary, assumption-based enforcement and misuse of governmental authority" with respect to plaintiff's properties, including their initiation and continuation of enforcement actions "made before factual verification," all of which "shocks the conscience and violates fundamental principles of ordered liberty." Dkt. No. 57 ¶¶ 33–49.

Defendants argue that this claim must be dismissed because the Fourth Amendment provides an explicit textual source of constitutional protection from the government conduct about which plaintiff has complained. Dkt. No. 60-1 at 11. Even assuming otherwise, defendants

contend that this claim fails because plaintiff's allegations fail to plausibly allege any conscience-shocking behavior. *See id.* at 12.

In opposition, plaintiff claims that he can maintain this substantive due process claim alongside his Fourth Amendment claims because it "challenges a different practice causing a different injury: the deliberate institutional methodology of imposing penalties before factual verification – assessing first and determining the facts later, if at all." Dkt. No. 65 at 9. In plaintiff's view, "[t]he imposition of a $1,200 penalty based on an unverified assumption is neither a search nor a seizure; the Fourth Amendment supplies no textual home for it, and Defendants identify none." *Id.* According to plaintiff, the conscience-shocking standard "is met at the pleading stage because the practice is deliberate, admitted, and systemic – not a misjudgment." *Id.* at 10.

Defendants reply that plaintiff's substantive due process claim remains based on the same "factual predicate" underlying his other claims, *i.e.*, the "same municipal enforcement sequence: the alleged entry, Stop Work Order, inspection demand, penalty, and prosecution." Dkt. No. 66 at 5. In defendants' view, plaintiff "is attempting to convert a code-enforcement dispute into a broad constitutional tort." *Id.* at 6.

The Fourteenth Amendment's Due Process Clause protects procedural and substantive rights. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). On the one hand, procedural due process imposes notice-and-hearing requirements that are meant to shield a person "from the mistaken or unjustified deprivation of life, liberty, or property," *Carey v. Piphus*, 435 U.S. 247, 259 (1978), while on the other hand, substantive due process protects against "government action that is arbitrary, conscience-shocking, or oppressive in the constitutional sense," *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).

Measured against this general legal standard, and even accounting for his *pro se* status, plaintiff's substantive due process claim must be dismissed. First, resort to substantive due process is generally inappropriate where, as here, specific constitutional provisions already provide an explicit source of protection against a particular sort of government behavior. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion); *Collins v. Putt*, 979 F.3d 128, 136 (2d Cir. 2020) (concluding same). In this case, defendants' alleged conduct is already actionable under the First and Fourth Amendments (as already discussed *supra*) and under the Fourteenth Amendment's equal protection clause (as will be explained *infra*).

Second, even assuming otherwise, plaintiff's amended complaint does not satisfy the relevant pleading standard. To plausibly allege a substantive due process claim, the plaintiff must identify state action that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Plaintiff has not met this standard. As the Second Circuit has cautioned, substantive due process "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005).

Instead, the doctrine operates as "an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). Plaintiff has alleged that one or more of the individual defendants exceeded the bounds of their legal authority in pursuing their code enforcement duties. That alleged conduct is certainly "incorrect or ill-advised." *Lowrance v. Achytl*, 20 F.3d 529, 537 (2d Cir. 1994) (cleaned up). And while it may prove to have been unlawful, this conduct is not "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale*, 170 F.3d at 263. Accordingly, defendants' motion to dismiss this claim must be granted.

**ii. Equal Protection** (Count Three)

In Count Three, plaintiff's amended complaint asserts a Fourteenth Amendment claim for a violation of his right to equal protection based on defendants' alleged decision to single him out for "active prosecution" of code violations based on his Chinese national origin, as evidenced by the fact that "53 of 54 similarly situated property owners showed no record of prosecution in the City's public records" even though these "similarly situated property owners included individuals with comparable or more severe alleged conditions." Dkt. No. 57 ¶¶ 50–63.

Insofar as this claim is based on plaintiff's membership in a protected class, defendants argue that this claim must be dismissed because the amended complaint fails to plausibly allege that any of the defendants "made a discriminatory statement, applied a facially discriminatory policy, treated a non-Chinese property owner more favorably under comparable circumstances, or was even aware of Plaintiff's national origin at the relevant time." Dkt. No. 60-1 at 13. Insofar as this claim is based on a so-called "class-of-one" theory, defendants argue that plaintiff has failed to plausibly allege that "any comparator property was the subject of a Stop Work Order, a Notice of Violation, and a missed compliance deadline—the specific chain of events that gave rise to the charge against Plaintiff." *Id.* at 14.

In opposition, plaintiff points out that defendants gloss over a third theory of relief under the equal protection clause: a "selective enforcement" theory. Dkt. No. 65 at 11. In plaintiff's view, he has plausibly alleged a claim under this body of law because his comparator allegations are sufficient, at the pre-answer stage, to warrant "discovery into records the City exclusively controls." *Id.* at 12. According to plaintiff, the available records show that the City pursued enforcement against him pursuant to a policy that has not been followed with respect to the proposed comparator properties. *Id.* at 12–13.

Defendants reply by emphasizing that plaintiff has not plausibly alleged any similarly situated comparators but has merely listed "different properties, different alleged conditions, and different categories of City action." Dkt. No. 66 at 6. In defendants' view, plaintiff's allegations identify "materially different properties, conditions, procedural histories, and enforcement actions." *Id*. at 7.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The clause's "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

To that end, there are a number of common methods for pleading an equal protection violation. *See, e.g.*, *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024). First, a plaintiff could identify a facially discriminatory statute or policy that "expressly classifies persons on the basis of race or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227–29 (1995)). Second, a plaintiff "could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). Third, a plaintiff could allege that a facially neutral law or policy was adopted with a discriminatory intent and its application has resulted in a discriminatory effect. *Red Earth LLC v. United States*, 657 F.3d 138, 146 (2d Cir. 2011) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).

With respect to these first three theories, a plaintiff "generally need not plead or show the disparate treatment of a similarly situated individual." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001). However, "the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

First, pursuant to *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing that "(1) the person, compared to others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995). "[T]he *LeClair* type of equal protection claim requires proof of disparate treatment and impermissible motivation." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005).

Second, pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), a plaintiff may assert a "class of one" claim by showing that "(1) he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment." *Id*. at 564 (cleaned up). "In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled in part by Appel*

*v. Spiridon*, 531 F.3d 138 (2d Cir. 2008); *see also Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008) (holding that a public employee may not assert a "class of one" claim).[9]

As the Second Circuit has explained, *LeClair* and *Olech* offer different paths for proving a non-class-based equal protection violation:

> While both types of Equal Protection claims require a showing that the plaintiff was treated differently from another similarly situated comparator, they differ in at least two key respects. First, unlike a malice-based *LeClair* claim, an *Olech* claim does not require proof of a defendant's subjective ill will towards a plaintiff. Instead, a plaintiff can prevail on an *Olech* claim on the basis of similarity alone. However, the similarity standard for an *Olech* claim is more stringent for the standard for a *LeClair* claim. While *Olech* requires an "extremely high" degree of similarity between a plaintiff and comparator, *LeClair* merely requires a "reasonably close resemblance" between a plaintiff's and comparator's circumstances.

*Hu*, 927 F.3d 81, 93 (2d Cir. 2019).

Measured against this general body of law, plaintiff has plausibly alleged a claim under *LeClair* and/or *Olech*. To be sure, "the Equal Protection Clause does not require perfectly uniform enforcement efforts." *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 320 (D. Conn. 2015), *aff'd sub nom. Gray v. Maquat*, 669 F. App'x 4 (2d Cir. 2016) (summary order). However, plaintiff has plausibly alleged that defendants "escalated" enforcement actions against him in retaliation for exercising his rights to complain about their allegedly unlawful conduct, including "his exercise of his right to petition." Dkt. No. 65 at 11; *see also Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) ("Where, as here, an equal protection claim is based on an alleged First Amendment violation, the former 'coalesces with the latter.'").

[9] In particular, "a plaintiff must establish that he and a comparator are '*prima facie* identical' by showing that '(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" *Hu v. City of N.Y.*, 927 F.3d 81, 92 (2d Cir. 2019) (cleaned up).

Plaintiff has also plausibly alleged, at least at this early stage of the case, that similarly situated property owners who did not engage in comparable protected conduct were treated more favorably than him. *See Hu*, 927 F.3d at 97 (collecting cases holding that the question of similarity is generally fact-intensive and context-dependent). Among other things, the question of whether defendants' continued enforcement actions vis-à-vis the initial building code violation (which eventually culminated in the filing of a state-court criminal charge) were purely ministerial steps in a progressive municipal policy or whether, as plaintiff seems to argue, those events were actually the product of intentional choices by municipal officials (as purportedly shown by the fact that other property owners with unremedied violations were not charged criminally) is a matter for discovery. Accordingly, defendants' motion to dismiss this claim will be denied.

**2. Municipal Liability** (Count Six)

In Count Six, plaintiff's amended complaint asserts a claim for municipal liability based on the City's alleged "policies, practices, and customs, including assumption-based enforcement, failure to apply governing procedures uniformly, and the absence of standards requiring factual verification prior to enforcement action, including under Standard Operating Procedure BRC-IP-03 governing Stop Work Orders" that "permits prosecution to proceed without prior factual verification, thereby causing constitutional deprivations by design." Dkt. No. 57 ¶¶ 90–98.

Defendants argue that this claim must be dismissed because Director LaJoy is not a final policymaker in the relevant area, the e-mails attributable to Senior Officer Gold and Director LaJoy do not reflect a persistent or widespread practice but merely "describe those individuals' own understanding of their authority in a single case," and plaintiff's complaints about the fact that the City's online portal "automatically designates" certain matters as "In Prosecution" upon case

creation is not enough to plausibly establish how any policy or custom caused the alleged constitutional violations that occurred. Dkt. No. 60-1 at 18–19.

In opposition, plaintiff insists that he has plausibly alleged that "senior officials confirmed the challenged practices in writing as departmental positions, not personal views: Gold's September 15, 2025 email states that warrantless entry based on suspected violations is the Department's position – 'No warrant is required' – and LaJoy's November 3, 2025 email confirms that assumption-based enforcement is standard practice: 'We always assume such until verified.'" Dkt. No. 65 at 20. In plaintiff's view, defendants' explanations about how the City's online portal operates "is a proper subject of discovery." *Id.* Further, plaintiff contends that he has plausibly alleged a "municipal custom" because he has identified a pattern of "comparative enforcement" that occurred over a period of years by multiple officials. *Id.* at 21. According to plaintiff, he has plausibly alleged that Director LaJoy possessed final policymaking authority because he "authorized, ratified, and enforced the challenged practices, demanded warrantless inspections, issued the Notice of Violation and Order to Abate, and articulated the assumption rule in writing." *Id.*

Defendants reply by reiterating that the cited e-mails attributed to Senior Officer Gold and Director LaJoy do not amount to a formal policy but are merely "alleged statements in one enforcement dispute, not a written municipal rule." Dkt. No. 66 at 10. In addition, defendants contend that plaintiff failed to plausibly allege that Director LaJoy is a final policymaker because his allegations only claim that LaJoy "ratified" certain actions. *Id.* In defendants' view, plaintiff's "comparator chart" fails to show "a citywide custom"; it merely "lists selected properties and conditions compiled by Plaintiff from portal searches and observations." *Id.* Finally, to the extent that plaintiff's claim might be understood as a "failure-to-train" claim, defendants argue that

plaintiff has failed to plead any "specific training deficiency" or "causal link between any deficiency and Plaintiff's alleged injury." *Id.* at 11.

To bring a § 1983 municipal liability claim, a plaintiff must plausibly allege the existence of an official policy or custom that caused him to be denied a constitutional right. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and may be "reflected in either action or inaction," *Cash v. County of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011).

The Supreme Court has recognized that *Monell* liability may be established through:

> (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to 'deliberate indifference' to the rights of those who come into contact with the inadequately trained or supervised municipal employees.

*Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (quoting *Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019) (summary order)).

Measured against this general legal standard, and after accounting for his *pro se* status, plaintiff has plausibly alleged a municipal liability claim. Briefly stated, plaintiff has alleged that Senior Officer Gold initiated an unfounded code enforcement proceeding against plaintiff's properties and then directed Officer Katsanis to conduct a search of private areas of the properties without consent, an administrative warrant, or some other exigency.

When plaintiff objected, Senior Officer Gold took the position—in writing—that municipal officials are permitted to enter a property's curtilage to conduct an inspection without an administrative warrant or consent. Plaintiff further objected to the lawfulness of this conduct to Director LaJoy, the Mayor, and the City Clerk. But Director LaJoy ignored his complaints and

escalated his enforcement approach. Plaintiff later filed a notice of claim, which caused the City's legal representatives to retaliate with threats of "unlimited" violations. Eventually, the City pursued a state-court criminal charge against plaintiff despite knowing it was doomed to failure because it was based on evidence obtained in violation of the constitution.

At the pre-answer stage, the Court declines to conduct a more granular examination of which particular *Monell* theory or theories of relief best supports these alleged facts—at the very least, the unlawful search claim, and perhaps the retaliation or malicious prosecution claims, appear to fit. Likewise, the Court declines to attempt to divine whether Director LaJoy qualifies as a final policymaker for purposes of *Monell* (although his job title indicates that, at a minimum, this is a fact question better suited for resolution after discovery).

For now, the Court concludes that this alleged conduct by senior City officials (whether undertaken in accordance with written municipal policies or pursuant to a widespread or customary deviation from the written version of those policies) qualifies as a "municipal policy or custom" that plausibly caused one or more constitutional harms to plaintiff. *See, e.g.*, *Fecteau v. City of Mount Vernon*, 2025 WL 873018, at *10 (S.D.N.Y. Mar. 20, 2025) (finding *Monell* claim plausibly alleged where official municipal ordinance authorized "broad searches during business hours without providing any warrant procedure or requirement, any opportunity for precompliance review, or any chance for the property owner or tenant to either consent to or challenge the warrantless search"). Accordingly, defendants' motion to dismiss this claim will be denied.

**B. New York Law** (Count Seven)

Finally, in Count Seven, plaintiff's amended complaint asserts a state-law claim for abuse of process based on defendants' alleged issuance of the Stop Work Order, the Notice of Violation,

and the criminal charge in an effort to "coerce" him "into submitting to a warrantless interior inspection of his home." Dkt. No. 57 ¶¶ 99–103.

Defendants argue that this claim must be dismissed because the amended complaint's factual allegations describe behavior "consistent with ordinary code enforcement, not a perverted use of process for an end outside it." Dkt. No. 60-1 at 20. Further, defendants point out that "New York courts have generally confined abuse of process to a mandate that issues from and is enforceable by a court – a subpoena, warrant, attachment, or execution – rather than an agency's own administrative acts." *Id*. Expanding on that point, defendants argue that plaintiff failed to comply with the notice-of-claim requirement vis-à-vis the February 2026 prosecution because he failed to serve a supplemental notice of claim. *Id*.

In opposition, plaintiff contends that he has plausibly alleged this claim because the amended complaint alleges that defendants used "the criminal process" to "pressure him into relinquishing his Fourth Amendment right to insist on a warrant." Dkt. No. 65 at 22–23. As for the notice-of-claim argument, plaintiff contends that the subsequent events (including the February 2026 criminal proceeding) arose from the "same enforcement course" as that already identified in his November 13, 2025 Notice of Claim. *Id*. at 23. To the extent the Court were to conclude otherwise, plaintiff argues that the dismissal should be without prejudice because he could seek leave to serve a late notice of claim from an appropriate state court. *Id*. at 24.

Defendants reply that plaintiff's amended complaint fails to plausibly allege any "improper purpose beyond or in addition to the proceeding itself." Dkt. No. 66 at 11. Further, defendants argue that the notice-of-claim filed in November of 2025 "could not have provided notice of an abuse-of-process claim based on later court process that did not yet exist." *Id*.

"In its broadest sense, abuse of process may be defined as the misuse or perversion of regularly issued legal process for a purpose not justified by the nature of the process." *Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Tchrs. Ass'n, Inc.*, 38 N.Y.2d 397, 400 (N.Y. 1975). Under New York law, a plaintiff may assert an abuse-of-process claim against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003).

Upon review, this claim must be dismissed. Putting aside for a moment the fact that this area of state law raises some challenging doctrinal issues, *see Wagner v. Hyra*, 518 F. Supp. 3d 613, 627–33 (N.D.N.Y. 2021), defendants correctly point out that the state-court "legal process" being challenged by plaintiff (from February of 2026) was issued months *after* plaintiff filed his Notice of Claim. Dkt. No. 60-1 at 20. Plaintiff acknowledges this apparent deficiency but asks the Court to dismiss the claim without prejudice, since he may be able to obtain leave to serve a late notice of claim from an appropriate state court. Dkt. No. 65 at 24. Accordingly, this claim will be dismissed without prejudice. *See Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1999).

## V. CONCLUSION

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss (Dkt. No. 60) is GRANTED in part and DENIED in part;
2. Plaintiff's 42 U.S.C. § 1983 substantive due process claim (Count Two) is DISMISSED;

3. Plaintiff's state-law abuse-of-process claim (Count Seven) is DISMISSED without prejudice;

4. Plaintiff's 42 U.S.C. § 1983 claims for an unlawful search[10] (Count One), a violation of equal protection (Count Three), malicious prosecution (Count Four), retaliation (Count Five), and municipal liability (Count Six) REMAIN for discovery; and

5. Defendants shall file and serve an answer to plaintiff's amended complaint (Dkt. No. 57) within FOURTEEN DAYS of the date of this opinion.

The Clerk of the Court is directed to terminate the pending motion and set a deadline accordingly.

**IT IS SO ORDERED.**

Dated: November 3, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge

[10] Count One is dismissed insofar as it "is construed to assert an independent Fourth Amendment claim based solely on" the warrantless entry to 47 Tampa Avenue. Dkt. No. 65 at 6.